DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
*Attorneys for Plaintiff Federal Insurance Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

FEDERAL INSURANCE COMPANY,

        Plaintiff,

    – against –

THE ESTATE OF IRVING GOULD, MEHDI
ALI, ALEXANDER M. HAIG, JR., THE
ESTATE OF RALPH SELIGMAN, BURTON
WINBERG AND J. EDWARD GOFF,

        Defendants.

No. 10 Civ. 1160 (RJS)

THE ESTATE OF IRVING GOULD, MEHDI
ALI, ALEXANDER M. HAIG, JR., THE
ESTATE OF RALPH SELIGMAN, BURTON
WINBERG AND J. EDWARD GOFF,

        Third-Party Plaintiffs,

    – against –

CHARTIS INSURANCE COMPANY OF
CANADA (f/k/a American Home Assurance
Company (Canada Branch)) and TRAVELERS
CASUALTY AND SURETY COMPANY (f/k/a
the Aetna Casualty and Surety Company),

        Third-Party Defendants.
------------------------------------------------------------x

FEDERAL INSURANCE COMPANY'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS

                      Joseph G. Finnerty III
                      Rachel V. Stevens
                      DLA PIPER LLP (US)
                      1251 Avenue of the Americas
                      New York, New York 10020
                      (212) 335-4500

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................ 3

ARGUMENT .............................................................................................................................. 8

I.    PENNSYLVANIA LAW GOVERNS THIS DISPUTE ................................................... 8

II.   UNDER THE EXPRESS TERMS OF THE FEDERAL EXCESS POLICIES, FEDERAL HAS NO OBLIGATION TO DROP-DOWN AND ADVANCE DEFENSE COSTS TO THE INSUREDS ............................................................................ 10

    A.   Pennsylvania Does Not Require an Excess Insurer to Drop Down Upon the Insolvency of Underlying Carriers ............................................................. 10

    B.   Pennsylvania Law Is Consistent with Other Jurisdictions Holding Excess Insurance Policies Are Not Triggered Unless or Until the Underlying Coverage Has Been Exhausted ........................................................ 12

CONCLUSION ......................................................................................................................... 14

# TABLE OF AUTHORITIES

Page(s)

CASES

Alabama Ins. Guar. Assoc. v. Kinder-Care, Inc.,
    551 So.2d 286 (Ala. 1989) .................................................................................................. 13

Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am.,
    47 F.3d 14 (2d Cir. 1995) ..................................................................................................... 8

Coffeyville Res. Ref. & Mktg., LLC v. Liberty,
    714 F. Supp. 2d 1119 (D. Kan. 2010) ................................................................................ 13

Comerica Inc. v. Zurich Am. Ins. Co.,
    498 F. Supp. 2d 1019 (E.D. Mich. 2007) ........................................................................... 12

Donegal Mut. Ins. Co. v. Long,
    528 Pa. 295, 597 A.2d 1124 (1991) ................................................................................... 10

Federal Ins. Co. v. Am. Home Assurance Co.,
    664 F. Supp. 2d 397 (S.D.N.Y. 2009) .................................................................................. 9

Gen. Refractories Co. v. Allstate Ins. Co.,
    No. CIV. A. 89-7924, 1994 WL 246375 (E.D. Pa. June 8, 1994) ..................................... 10

Great Am. Ins. Co. v. Bally Total Fitness Holding Corp.,
    No. 06C 4554, 2010 WL 2542191 (N.D. Ill. June 22, 2010) ............................................. 12

Hayden v. Paterson,
    594 F.3d 150 (2d Cir. 2010) ................................................................................................. 8

Highlands Ins. Co. v. Gerber Prod. Co.,
    702 F. Supp. 109 (D. Md. 1988) ........................................................................................ 13

J. Kinderman & Sons, Inc. v. United Nat'l Ins. Co.,
    406 Pa. Super. 37, 593 A.2d 857 (Pa. Super. Ct. 1991),
    aff'd, 619 A.2d 1058 (Pa. 1993) .................................................................................... 10, 11

M.A.G. Enters., Inc. v. Nat'l Union Fire Ins. Co.,
    No. 3835 Aug. Term 2002, 2005 WL 503053
    (Pa. Comm. Pl. Feb. 16, 2005) ...................................................................................... 10, 11

Nationwide Ins. Co. v. Horace Mann Ins. Co.,
    2000 Pa. Super. 245, 759 A.2d 9 (Pa. Super. Ct. 2000) ..................................................... 10

Occidental Fire and Cas. Co. of N.C. v. Brocious,
    772 F.2d 47 (3d Cir. 1985) ................................................................................................. 11

Olin Corp. v. Ins. Co. of N. Am.,
   743 F. Supp. 1044 (S.D.N.Y. 1990),
   aff'd, 929 F.2d 62 (2d Cir. 1991)..................................................................................9

Prentice v. Apfel,
   11 F. Supp. 2d 420 (S.D.N.Y. 1998)............................................................................8

Qualcomm, Inc. v. Certain Underwriters at Lloyd's London,
   73 Cal. Rptr. 3d 770 (Cal. App. 2008).................................................................12, 13

Schwartz v. Liberty Mut. Ins. Co.,
   539 F.3d 135 (2d Cir. 2008)........................................................................................9

Span, Inc. v. Associated Int'l Ins. Co.,
   227 Cal.App.3d 463 (2d Dist. 1991)..........................................................................13

VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.,
   594 F. Supp. 2d 334 (S.D.N.Y. 2008).........................................................................8

OTHER AUTHORITIES

Fed. R. Civ. P. 12 (b)(6).........................................................................................................8

Fed. R. Civ. P. 12(c) ................................................................................................1, 8, 13

Federal Insurance Company ("Federal"), submits this memorandum of law in support of its motion for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, seeking a declaration that the excess directors and officers liability insurance policies Federal issued to Commodore International Limited ("Commodore") have not been triggered and that Federal, accordingly, has no obligation to drop down and advance Defense Costs to Commodore's former officers and directors.

## PRELIMINARY STATEMENT

Once an industry leader in the computer business, Commodore ceased operating and filed for bankruptcy in 1994. At the time of its bankruptcy filing, Commodore had in place a directors and officers liability insurance tower comprised of $51 million in coverage provided by five different insurance companies which collectively issued policies in nine layers of coverage. The primary policy, which provided $10 million of coverage, was exhausted by the payment of defense and settlement costs in connection with numerous lawsuits commenced against Commodore and its directors and officers upon the company's demise. Only one of these underlying actions remains, and it is pending in the Supreme Court of the Commonwealth of the Bahamas and captioned Wilson v. Gould, et al., 1994 No. 473/581 (the "Bahamas Litigation").

Four of Commodore's eight excess insurance policies—constituting $20 million in excess coverage—were issued by insurance companies that are now insolvent and in liquidation. Federal, one of the remaining solvent excess carriers, underwrote two of the eight excess policies, the Second Excess Policy and the Fifth Excess Policy (collectively, the "Federal Excess Policies"). Both of these policies expressly provides that coverage is triggered only after the exhaustion of all of the total limits of liability of all underlying policies "by payment of claims."

The policies whose limits remain to be exhausted underlying the Federal Excess Policies were issued by insurance companies that are now insolvent and presently unable to advance or pay any amounts.

Commodore, on behalf of it's directors and officers—the Estate of Irving Gould, Mehdi Ali, Alexander M. Haig, Jr., the Estate of Ralph Seligman, Burton Winberg and J. Edward Goff, (Defendants or "Insureds")—submitted claims to Federal seeking coverage for Defense Costs (as that term is defined in the Federal Excess Policies) in connection with the Bahamas Litigation in which the Insureds are named as defendants. After entering into an interim funding agreement in which it preserved its right to contest any legal obligation to pay, Federal chose to advance Defense Costs under the Second Excess Policy—despite the failure of the underlying policies to exhaust "by payment of claims" as required for coverage to apply. The $5 million limit of liability under the Second Excess Policy is now nearly all paid out pursuant to that agreement, and Federal faces the prospect of being asked to advance Defense Costs under its Fifth Excess Policy.

The following facts are not disputed:

1. The provisions mandating exhaustion of all underlying insurance "by payment of claims" before Federal's coverage is triggered are terms in the insurance coverage agreement between the parties;

2. The Underlying Insurance provided by excess insurers underlying the Federal Excess Policies has not been exhausted "by payment of claims." In fact, the insolvent underlying insurers have not paid any amount in connection with the Bahamas Litigation or any other claims against Commodore or its directors and officers; and

2

3. The total of all Defense Costs incurred in defending claims against the Commodore directors and officers would not yet have exhausted the total limits of liability of the Underlying Insurance if the insolvent underlying insurers had been solvent and paying all such Defense Costs.

Since exhaustion "by payment of claims" is required for coverage to apply under the Federal Excess Policies, Federal's policies are not yet triggered, and Federal has no obligation to drop down and pay Defense Costs in place of the insolvent Underlying Insurers.

## STATEMENT OF FACTS

### The Federal Excess Policies

In 1993, Federal issued to Commodore second-layer Excess Directors and Officers Liability and Reimbursement Policy number 8141-5813 (the "Second Excess Policy") and fifth-layer Excess Directors and Officers Liability and Reimbursement Policy number 8141-5814 (the "Fifth Excess Policy"). (See Declaration of Rachel V. Stevens, dated December 15, 2010 ("Stevens Decl."), Ex. 1, ¶¶29, 32; Ex. 2, at Exs. B, C.) The initial policy period for the Federal Excess Policies was November 8, 1993 to November 8, 1994, but was subsequently extended by endorsement to expire on November 8, 1997. (Id.) The Federal Excess Policies were issued to Commodore at its principal place of business in West Chester, Pennsylvania. (See Stevens Decl., Ex. 1, ¶ 22; Ex. 2, ¶ 22; Ex. 2, at Exs. B, C.) At the time they were issued, Federal was (and remains) located in New Jersey. (See Stevens Decl., Ex. 2, at Exs. B, C).

As illustrated by the coverage chart below, the Second Excess Policy has a limit of liability of $5 million, excess of a $1 million self-insured retention plus $15 million in underlying insurance that is comprised of a $10 million Directors and Officers Liability and Reimbursement Policy No. 970-4185 (the "Primary Policy") issued by American Home

3

Insurance Company ("American Home") and a $5 million Excess Financial Products Insurance Policy No. NDA 1498322-91 (the "First Excess Policy") issued by Reliance Insurance Company ("Reliance"). (See Stevens Decl., Ex. 1, ¶¶ 27-29.) The Primary Policy was issued to Commodore from American Home's offices in Canada, and was negotiated by a Canadian broker. (See Stevens Decl., Ex. 2, at Ex. A.)

The Fifth Excess Policy has a limit of liability of $5 million, excess of the same $1 million self-insured retention plus $30 million in underlying insurance that is comprised of the $10 million Primary Policy, the $5 million First Excess Policy, the $5 million Second Excess Policy, a $5 million Directors and Officers Liability Company Reimbursement Policy No. ZDO-F 983337-3/000 (the "Third Excess Policy") issued by The Home Insurance Company of Indiana ("The Home") and a $5 million Excess Financial Products Insurance Policy No. NDA 01111997-93 (the "Fourth Excess Policy") issued by Reliance. (See Stevens Decl., Ex. 1, ¶¶ 30-32.)

## Commodore International Limited

| Self-Insured Retention (See Stevens Decl., Ex. 4, at Ex. 3.) |
|---|
| $1,000,000 |
| **Primary: $10m (See Stevens Decl., Ex. 1, at ¶ 27.)** |
| American Home Insurance Company<br>Policy no. 970-4185 |
| **First Excess: $5m xs $10m (See Stevens Decl., Ex. 1, at ¶ 28.)** |
| Reliance<br>Policy no. NDA 1498322-91 |
| **Second Excess: $5m xs $15m (See Stevens Decl., Ex. 1, at ¶ 29.)** |
| Federal<br>Policy no. 8141-5813 |
| **Third Excess: $5m xs $20m (See Stevens Decl., Ex. 1, at ¶ 30.)** |
| The Home Insurance Company of Indiana<br>Policy no. ZDO-F 983337-3/000 |

4

■ Insurer is insolvent and in liquidation.

| | |
|---|---|
| Fourth Excess: $5m xs $25m (See Stevens Decl., Ex. 1, at ¶ 31.) | |
| Reliance Policy no. NDA 01111997-93 | |
| Fifth Excess: $5m xs $30m (See Stevens Decl., Ex. 1, at ¶ 32.) | |
| Federal Policy no. 8141-5814 | |
| Sixth Excess: $5m xs $35m (See Stevens Decl., Ex. 1, at ¶ 33) | |
| The Home Policy no. ZDO-F-983338-3/000 | |
| Seventh Excess: $10m xs $40m (See Stevens Decl., Ex. 1, at ¶ 34.) | |
| Aetna Policy no. 095 LB 095 000 440 BCA | |
| Eight Excess: $1m xs $50m (See Stevens Decl., Ex. 1, at ¶ 35.) | |
| American Home Policy no. 970-4712 | |

The Federal Excess Policies incorporate by reference the terms and conditions of the Primary Policy, except as to the limits of liability and other terms and conditions specified in the Federal Excess Policies. The following provisions of the Federal Excess Policies are relevant to Federal's motion:

> **Insuring Clause** [as amended by Endorsement No. 3]
>
> The Company shall provide the **"Insured"** with Insurance during the Policy Period excess of the **"Underlying Insurance"**. Coverage hereunder shall attach only after all such **"Underlying Insurance"** has been *exhausted by payment of claim(s)* and shall then apply in conformity with the terms, conditions, exclusions and endorsements of the **"Primary Policy"**, together with all limitations, restrictions or exclusions contained in or added by endorsement to any other **"Underlying Insurance"**, except as specifically set forth in the terms and conditions and endorsements of this policy. In no event shall this policy grant broader coverage than would be provided by any of the exhausted **"Underlying Insurance"**.

(See Stevens Decl., Ex. 2, at Exs. B, C) (emphasis added).

5

☐ Insurer is insolvent and in liquidation.

### Maintenance of Underlying Insurance

All of the Underlying Policy(ies) scheduled in Item 4 of the Declarations shall be maintained during the Policy Period in full effect and affording coverage at least as broad as the **Primary Policy**, except for any reduction of the aggregate limit(s) of liability available under the **Underlying Insurance** solely by reason of payment of losses thereunder. Failure to comply with the foregoing shall not invalidate this policy, but the Company shall not be liable to a greater extent than if this condition had been complied with.

(Id.)

### Depletion of Underlying Limit(s)

In the event of the depletion of the limit(s) of liability of the **Underlying Insurance** solely as a result of payment of losses thereunder, this policy shall, subject to the Company's limit of liability and to the other terms of the policy, continue to apply for subsequent losses as excess insurance over the amount of insurance remaining under such **Underlying Insurance**. In the event of the exhaustion of all of the limit(s) of liability of such **Underlying Insurance** solely as a result of payment of losses thereunder, the remaining limits available under this policy shall, subject to the Company's limit of liability and to the other terms and conditions of the policy, continue for subsequent losses as primary insurance and any retention specified in the **Primary Policy** shall be imposed under this policy; otherwise no retention shall be imposed under this policy.

(Id.) Section 9 of the Primary Policy, captioned "Defense Costs, Settlements, Judgments (Including The Advancement of Defense Costs)," states in relevant part that

> [u]nder Coverage A, except as hereinafter stated, the Insurer shall advance **Defense Costs** prior to the final disposition of the claim, unless such **Defense Costs** have been advanced by [Commodore]. . . .

(See Stevens Decl., Ex. 2, at Ex. A.)

Commodore Goes Out of Business

Once an industry leader in the computer business, Commodore filed for bankruptcy in 1994. (See Stevens Decl., Ex. 2, Counterclaim ¶ 16.) At all times relevant to this action, Commodore had its principal place of business in West Chester, Pennsylvania, and was

6

incorporated in the Bahamas. (See Stevens Decl., Ex. 1, ¶ 22; Ex. 2, ¶ 22; Ex. 2, at Exs. B, C.) Beginning in 1993, and continuing through its ultimate demise, various lawsuits were filed against Commodore and its directors and officers, including the Bahamas Litigation. (See Stevens Decl., Ex. 1, ¶¶ 39-40.) As a result of its insolvency, Commodore has been unable to indemnify its directors and officers in these matters. (See Stevens Decl., Ex. 1, ¶ 21.) Upon notice of the lawsuits, American Home initially advanced Defense Costs under the Primary Policy. (See Stevens Decl., Ex. 1, ¶ 41.)

Defendants advised Federal that American Home has exhausted the $10 million limit of the Primary Policy by payment of settlements and Defense Costs in connection with the Bahamas Litigation and other claims against the Defendants. (See Stevens Decl., Ex. 1, ¶ 41.)

Reliance is Ordered Into Liquidation

In 2001, Reliance was ordered into liquidation at the request of the Pennsylvania Insurance Department and is currently unwilling to advance amounts under the First or Fourth Excess Policies or to commit to their payment at some later date.[1] (See Stevens Decl., Ex. 1, ¶¶ 42-44.) Consequently, Defendants requested that Federal advance Defense Costs under the Federal Excess Policies. (See Stevens Decl., Ex. 1, ¶ 47.) In 2005, Federal entered into an interim funding agreement (the "IFA") under the terms of which Federal agreed to advance

---

[1] Similarly, the Home Insurance Company was ordered into liquidation in 2003 at the request of the New Hampshire Insurance Commissioner and is also unlikely to pay or advance funds under the Third Excess Policy. (See Stevens Decl., Ex. 1, ¶¶ 45-46.)

Defense Costs (as defined by the Federal Excess Policies), pursuant to a full reservation of its rights under the Federal Excess Policies.[2] (See Stevens Decl., Ex. 1, ¶¶ 48-50.)

For the reasons that follow, the Court should enforce the plain language of the Federal Excess Policies, find that these policies are not triggered, and find that Federal is not obligated to drop down and advance Defendants Costs because the Underlying Insurance is not exhausted by payment of claims.

## ARGUMENT

The standard for deciding a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is the same as that employed on a motion to dismiss pursuant to Rule 12(b)(6). See Hayden v. Paterson, 594 F.3d 150, 157 n.4 (2d Cir. 2010). Accordingly, judgment on the pleadings is appropriate "'if, from the pleadings, [it is evident that] the moving party is entitled to judgment as a matter of law.'" VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A., 594 F. Supp. 2d 334, 340 (S.D.N.Y. 2008) (quoting Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am., 47 F.3d 14, 16 (2d Cir. 1995)). In deciding a motion pursuant to Rule 12(c), the Court may consider the pleadings as well as any documents or statements attached to or incorporated by reference in the pleadings. Id. at 339-40 (citing Prentice v. Apfel, 11 F. Supp. 2d 420, 424 (S.D.N.Y. 1998)).

---

[2] Although the IFA was initially subject to Federal's reservation of all of its rights under the Federal Excess Policies and at law, including the right to seek reimbursement from the Insureds of any amount advanced thereunder, Federal subsequently agreed in 2006 that it would not seek reimbursement of amounts advanced under the IFA. (See Stevens Decl., Ex. 1, ¶ 51.)

8

I.

<u>PENNSYLVANIA LAW GOVERNS THIS DISPUTE</u>

Pennsylvania law applies to resolve the question presented here—whether Federal is obligated to drop down to advance Defense Costs. The Federal Excess Policies provided excess directors and officers liability insurance coverage to Commodore. The principal location of Commodore, and the home office from which it conducted its corporate business was in West Chester, Pennsylvania, and the Federal Excess Policies were issued to Commodore at its "Principal Address" in West Chester, Pennsylvania. (See Stevens Decl., Ex. 2, at Exs. B, C.) In their Answer and Counterclaims in this action, the Insureds pleaded (and therefore admitted) that Commodore's principal place of business was in Pennsylvania. The Insureds also denied Federal's allegation that Commodore maintained any books or records in its New York corporate offices. (See Stevens Decl., Ex. 2, ¶ 22.) The Federal Excess Policies were sent to Commodore at its West Chester, Pennsylvania address, and endorsements to the Federal Excess Policies were issued to Commodore in Pennsylvania. (See Stevens Decl., Ex. 2, at Exs. B, C.)

This court recently held that New York courts consider the following factors when deciding choice of law questions in the context of insurance coverage disputes:

> the location of the insured risk; the insured's principal place of business; where the policy was issued and delivered; the location of the broker or agent placing the policy; where the premiums were paid; and [the] insurer's place of business.

<u>Federal Ins. Co. v. Am. Home Assurance Co.</u>, 664 F. Supp. 2d 397, 404 (S.D.N.Y. 2009) (citing <u>Olin Corp. v. Ins. Co. of N. Am.</u>, 743 F. Supp. 1044, 1049 (S.D.N.Y. 1990), <u>aff'd</u> 929 F.2d 62 (2d Cir. 1991)). These factors point overwhelming in this case to Pennsylvania, and its laws accordingly should apply to govern resolution of this dispute about the terms of the insurance contract at issue. See <u>Schwartz v. Liberty Mut. Ins. Co.</u>, 539 F.3d 135, 151 (2d Cir. 2008) (New

9

York courts "should apply 'the local law of the state which the parties understood was to be the principal location of the insured risk'") (quoting the Restatement (Second) of Conflicts of Laws § 193 (1971)).

II.

## UNDER THE EXPRESS TERMS OF THE FEDERAL EXCESS POLICIES, FEDERAL HAS NO OBLIGATION TO DROP-DOWN AND ADVANCE DEFENSE COSTS TO THE INSUREDS

### A.  Pennsylvania Does Not Require an Excess Insurer to Drop Down Upon the Insolvency of Underlying Carriers

Pennsylvania courts strictly enforce the unambiguous provisions of an insurance policy. See, e.g., M.A.G. Enters., Inc. v. Nat'l Union Fire Ins. Co., No. 3835 Aug. Term 2002, 2005 WL 503053, at *3 (Pa. Comm. Pl. Feb. 16, 2005). Consistent with this principle, Pennsylvania courts hold that where, as here, a policy states that its coverage is triggered only after coverage under a primary policy (or other underlying excess coverage) has been exhausted, the insolvency of an underlying insurance policy cannot form the basis for triggering the excess policy. In short, under Pennsylvania law, the failure of underlying insurance to pay due to insolvency will not increase the excess insurer's liability. Id. at *5; see also Gen. Refractories Co. v. Allstate Ins. Co., No. CIV. A. 89-7924, 1994 WL 246375, at *7 (E.D. Pa. June 8, 1994) (excess carrier "is not required to drop down and provide [insured] with primary coverage for the period in which [insolvent primary carrier] was the primary insurer"); Donegal Mut. Ins. Co. v. Long, 528 Pa. 295, 299-300, 597 A.2d 1124, 1126-27 (1991) (excess insurer not required to "drop down" and assume position of insolvent underlying insurer); Nationwide Ins. Co. v. Horace Mann Ins. Co., 2000 Pa. Super. 245, 759 A.2d 9, 13 (Pa. Super. Ct. 2000) (excess insurance is not collectible for underlying coverage); J. Kinderman & Sons, Inc. v. United Nat'l Ins. Co., 406 Pa. Super. 37, 41-42, 593 A.2d 857, 860 (Pa. Super. Ct. 1991) (same), aff'd, 619 A.2d 1058 (Pa. 1993); accord

10

Occidental Fire and Cas. Co. of N.C. v. Brocious, 772 F.2d 47, 54 (3d Cir. 1985) (until underlying policies have been exhausted, excess insurer has no liability to insured).

Pennsylvania courts reach this conclusion even where, as here, the excess policy is silent about the consequences of the primary insurer's insolvency. In Kinderman, 406 Pa. Super. 37, 593 A.2d 857, the Pennsylvania Superior Court held that an excess umbrella insurer was not required to drop down and provide underlying primary coverage upon the insolvency of the primary insurer, notwithstanding the fact that the excess policy did not directly address the impact of the insolvency of an underlying insurer. Id., 406 Pa. Super. at 41-42, 593 A.2d at 860. In that case, the Court found no ambiguity in the language of the "Underlying Insurance" and "Maintenance of Underlying Insurance" provisions of the excess policy—both of which track the language at issue here in the Federal Excess Policies—and determined based on this clear language that the excess carrier was not obligated "to provide coverage until after the underlying insurance carrier's amount was fulfilled." Id. 406 Pa. Super. at 41, 593 A.2d at 860; see also M.A.G. Enters., 2005 WL 503053, at *5 ("in Pennsylvania, an excess insurer is not required to drop down to provide primary coverage where the underlying primary insurer is insolvent, unless required to do so by the policy itself").

The Federal Excess Policies state that coverage will "attach only after" underlying coverage has been "exhausted by payment of claim(s)," and once the underlying policies have been exhausted in accordance with these terms, the Federal Excess Policies "shall then apply." (See Stevens Decl., Ex. 2, at Exs. B, C) (emphasis added). The Federal Excess Policies also require Commodore to maintain all underlying coverage "in full effect" and state that, if all underlying policies are not so maintained, Federal "shall not be liable to a greater extent than if this condition had been complied with." (Id.) Under these circumstances, the Federal Excess

Policies have not been triggered as a matter of law, and Federal has no obligation to provide coverage to the Insureds for their Defense Costs.

      B.     Pennsylvania Law Is Consistent with Other Jurisdictions Holding Excess Insurance Policies Are Not Triggered Unless or Until the Underlying Coverage Has Been Exhausted

Courts in other jurisdictions reach the same conclusion as Pennsylvania. In particular, courts across the country agree that the insolvency of an underlying insurer does not require an excess carrier to drop down where, as here, the excess policy states that it attaches only when coverage under the underlying policies is reduced or exhausted "solely as a result of payment of losses thereunder." (Stevens Decl., Ex. 2 at Exs. B, C.) In Great American Ins. Co. v. Bally Total Fitness Holding Corp., No. 06C 4554, 2010 WL 2542191 (N.D. Ill. June 22, 2010), the Northern District of Illinois held that excess insurers who issued third and fourth layer policies were not obligated to drop down and provide coverage because neither the primary carrier nor the first and second layer excess carriers had made actual payments of the full limits of their respective liabilities. Id. at *5. In so doing, the court held that it was enforcing the plain language of the policies which, in language that conveys the essential terms of coverage at issue here, required payment of the full amount of underlying coverage before the excess policy was triggered. Id.

Similarly, the courts in Comerica Inc. v. Zurich Am. Ins. Co., 498 F. Supp. 2d 1019 (E.D. Mich. 2007), and Qualcomm, Inc. v. Certain Underwriters at Lloyd's London, 73 Cal. Rptr. 3d 770 (Cal. App. 2008), both held that coverage under an excess policy is not triggered if the underlying carrier has contributed less than its policy limits to a settlement and the excess policy provides that the excess carrier is liable only after the underlying carrier has actually paid the full amount of its liability. Comerica, 498 F. Supp. 2d 1019, 1020 (applying Michigan law to an

excess policy which stated that coverage is triggered "after all such 'Underlying Insurance" has been reduced or exhausted by payments for losses"); Qualcomm, 73 Cal. Rptr. 3d 770. 774 (applying California law to an excess policy which stated that the excess carrier was liable "only after the insurers under each of the Underlying Policies have paid . . . the full amount of the Underlying Limit of Liability"). See also Coffeyville Res. Ref. & Mktg., LLC v. Liberty, 714 F. Supp. 2d 1119, 1160 (D. Kan. 2010) (to the extent "the National Union policy is excess, and National Union has no duty to pay until exhaustion of the Illinois Union coverage is established"); Highlands Ins. Co. v. Gerber Prod. Co., 702 F. Supp. 109, 113 (D. Md. 1988) (excess insurer not required to drop down because "this language self-evidently does not include 'reduction' or 'exhaustion' caused by the insolvency of the underlying insurer"); Alabama Ins. Guar. Assoc. v. Kinder-Care, Inc., 551 So.2d 286, 289 (Ala. 1989) ("[excess policy] language cannot be reasonably interpreted to mean that the [excess carrier] was contracting to insure the solvency of the underlying carrier, . . . but rather, the [excess carrier] was agreeing to pay claims in excess of the amounts paid according to the limits of the underlying policy"); Span, Inc. v. Associated Int'l Ins. Co., 227 Cal.App.3d 463, 476 (2d Dist. 1991) ("policy unambiguously contemplates 'exhaustion' of the underlying insurance only by payment of the underlying limits either by the insured or its primary carrier") (emphasis in original).

As required by Pennsylvania law and consistent with the law of many other jurisdictions that have considered the question, the unambiguous language of the Federal Excess Policies controls here, and Federal has no obligation to drop down and pay Defense Costs.

## CONCLUSION

For the reasons set forth above, Federal respectfully requests that the Court grant its motion, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, seeking a declaration that Federal has no obligation to drop down and pay Defense Costs to Commodore's former officers and directors, and grant such other and further relief as the Court may deem just and proper under the circumstances.

Dated: New York, New York
       December 15, 2010

DLA PIPER LLP (US)

By: _____
Joseph G. Finnerty III
Rachel V. Stevens
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501
E-mail: joseph.finnerty@dlapiper.com
        rachel.stevens@dlapiper.com

*Attorneys for Plaintiff Federal Insurance Company*