# UNITED STATES COURT OF APPEALS
# FOR THE
# SECOND CIRCUIT

**MANDATE**

USDC - SDNY
1:10-cv-01160-RJS

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 28, 2013

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 4th day of June, two thousand and thirteen.

Before: JOSÉ A. CABRANES,
      DENNY CHIN,
      SUSAN L. CARNEY,
      *Circuit Judges*.

_____

Mehdi Ali, The Estate of Alexander M. Haig, Jr., The Estate of Ralph Seligman, Burton Winberg, J. Edward Goff, The Estate of Irving Gould,

    Appellants,

    v.

Federal Insurance Company, Travelers Casualty and Surety Company of America,

    Appellees.

_____

**JUDGMENT**

Docket No. 11-5000

The appeal in the above captioned case from judgment of the United States District Court for the Southern District of New York was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is AFFIRMED in accordance with the opinion of this court.

For The Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

MANDATE ISSUED ON 08/28/2013

11-5000-cv
*Ali v. Fed. Ins. Co.*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: October 26, 2012      Decided: June 4, 2013)

Docket No. 11-5000-cv

_____

MEHDI ALI, THE ESTATE OF ALEXANDER M. HAIG, JR., THE ESTATE OF
RALPH SELIGMAN, BURTON WINBERG, J. EDWARD GOFF, THE ESTATE OF
IRVING GOULD,

*Appellants*,

v.

FEDERAL INSURANCE COMPANY, TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA,

*Appellees*.

_____

Before: CABRANES, CHIN and CARNEY, Circuit Judges.

      This insurance case raises two issues. First, we consider our appellate jurisdiction. Although we usually may not review voluntary dismissals of claims or denials of motions for summary judgment, this case presents the unusual situation in which we are asked to review the voluntary dismissal of a claim following the denial of a motion for summary judgment. Our review is appropriate in these circumstances because (1) the United States District Court for the Southern District of New York (Richard J. Sullivan, *Judge*) rejected the legal basis for the appellants' counter-

1

claim; (2) the District Court disposed of all claims with prejudice; and (3) the appellants consented to the final judgment solely to obtain immediate appeal of the prior adverse decision, without pursuing piecemeal appellate review.

Second, we interpret several "excess" liability insurance policies, which provide insurance protection beyond the protection provided by underlying policies. Each excess liability insurance policy at issue includes an exhaustion clause, which states that the excess insurance coverage attaches only after a certain amount of underlying insurance coverage is exhausted "as a result of payment of losses thereunder." Based on this language, the insured appellants argue that their *liability* must reach the attachment point in order to trigger the excess coverage. By contrast, the insurer appellees argue that that the excess liability coverage is only triggered when liability *payments* reach the attachment point. We conclude that the plain language of the insurance policies supports the view of the insurer appellees.

Affirmed.

>   FINLEY T. HARCKHAM (Rene F. Hertzog, *on the brief*), Anderson Kill & Olick, P.C., New York, NY, *for Appellants*.
>
>   JOSEPH G. FINNERTY, III (Rachel V. Stevens, *on the brief*), DLA Piper LLP (US), New York, NY, *for Appellee Federal Insurance Company*.
>
>   JAMES T. SANDNES (James A. Skarzynski, Tammy Yuen, *on the brief*), Boundas, Skarzynski, Walsh & Black, LLC, New York, NY, *for Appellee Travelers Casualty and Surety Company of America*.

JOSÉ A. CABRANES, *Circuit Judge*:

This insurance case raises two issues. First, we consider our appellate jurisdiction. Although we usually may not review voluntary dismissals of claims or denials of motions for summary judgment, this case presents the unusual situation in which we are asked to review the voluntary

2

dismissal of a claim following the denial of a motion for summary judgment.  Our review is appropriate in these circumstances because (1) the United States District Court for the Southern District of New York (Richard J. Sullivan, *Judge*) rejected the legal basis for the appellants' counter-claim; (2) the District Court disposed of all claims with prejudice; and (3) the appellants consented to the final judgment solely to obtain immediate appeal of the prior adverse decision, without pursuing piecemeal appellate review.

Second, we interpret several "excess" liability insurance policies, which provide insurance protection beyond the protection provided by underlying policies.  Each excess liability insurance policy at issue includes an exhaustion clause, which states that the excess insurance coverage attaches only after a certain amount of underlying insurance coverage is exhausted "as a result of payment of losses thereunder."  Based on this language, the insured appellants argue that their *liability* must reach the attachment point in order to trigger the excess coverage.  By contrast, the insurer appellees argue that the excess liability coverage is only triggered when liability *payments* reach the attachment point.  We conclude that the plain language of the insurance policies supports the view of the insurer appellees.  Accordingly, the judgment of the District Court is affirmed.

## BACKGROUND

The appellants are the former directors and officers (collectively, "the Directors") of Commodore International Limited ("Commodore"), a computer technology company that in 1994 ceased operations and filed for bankruptcy.[1]  By the time that Commodore filed for bankruptcy, it had purchased a series of insurance policies designed to protect the Directors from potential liability.  The "primary" insurance policy covered the first $10 million in liability, and each successive

---

[1] In the District Court, the Directors were (1) defendants in the declaratory relief action brought by Federal Insurance Company ("FIC"); (2) counter-claimants in the declaratory relief action against FIC; and (3) third-party plaintiffs in the declaratory relief action against Travelers Casualty and Surety Company of America ("Travelers") and Chartis Insurance Company of Canada ("Chartis").  Chartis was dismissed from the case with prejudice by the District Court and is not a party to this appeal.  The relevant Travelers insurance policy was originally issued by the Aetna Casualty and Surety Company.

3

"excess" insurance policy provided a discrete level of coverage in excess of the coverage in the "underlying" agreements, thus creating a layered "tower" of liability protection.[2] For instance, the first excess policy provided $5 million of protection *in excess of* $10 million in liability payments (the first excess policy's "attachment point"), the second excess insurance policy provided $5 million of protection *in excess of* $15 million in liability payments, and so on. This suit arose because two of the underlying insurers—Reliance Insurance Company ("Reliance") and the Home Insurance Company ("Home")—have ceased operations and liquidated their assets.[3]

Appellee Federal Insurance Company ("FIC") is the still-operational provider of the Directors' second and fifth excess insurance policies. *See* note 2, *ante*. Anticipating that the Directors would file claims relating to a suit pending in the Supreme Court of the Commonwealth of the Bahamas (the "Bahamas Litigation"),[4] FIC filed a declaratory relief action against the Directors in the Southern District of New York, seeking a declaration that, under the terms of the relevant insurance policies, FIC is not required to "drop down" to cover liability that would have otherwise

---

[2] The District Court's opinion includes the following chart that usefully summarizes the Directors' insurance tower:

| Policy | Liability Limit | Covers Liability in Excess Of |
|---|---|---|
| Self-Insured | $1,000,000 | N/A |
| Primary: Chartis | $10,000,000 | N/A |
| 1st Excess: Reliance | $5,000,000 | $10,000,000 |
| 2nd Excess: Federal [FIC] | $5,000,000 | $15,000,000 |
| 3rd Excess: The Home Ins[.] Co. | $5,000,000 | $20,000,000 |
| 4th Excess: Reliance | $5,000,000 | $25,000,000 |
| 5th Excess: Federal [FIC] | $5,000,000 | $30,000,000 |
| 6th Excess: The Home Ins[.] Co. | $5,000,000 | $35,000,000 |
| 7th Excess: Travelers | $10,000,000 | $40,000,000 |
| 8th Excess: Chartis | $1,000,000 | $50,000,000 |

*Fed. Ins. Co. v. Estate of Gould*, No. 10 Civ. 1160 (RJS), 2011 WL 4552381, at *1 (S.D.N.Y. Sept. 28, 2011).

[3] Accordingly, the Directors will not be reimbursed for claims filed under the first, third, fourth, and sixth "excess" policies in the tower. *See* note 2, *ante*.

[4] The District Court noted that "[t]o date, [the Directors] have incurred approximately $14 million in losses as a result of the various lawsuits" that followed Commodore's filing for bankruptcy protection. *Fed. Ins. Co.*, 2011 WL 4552381, at *1. The appellees subsequently filed a motion on appeal requesting that we take judicial notice of a reportedly large settlement between the Directors and the plaintiffs in the Bahamas litigation. *See* ECF No. 114 (motion for judicial notice dated Sept. 14, 2012). That motion is denied. Whether the Directors have settled with third parties for a large amount does not influence our interpretation of the relevant insurance provisions.

4

been covered by Reliance and Home. FIC moved for judgment on the pleadings. The District Court granted FIC the requested declaratory relief in an order dated September 28, 2011. *See Fed. Ins. Co. v. Estate of Gould*, No. 10 Civ. 1160 (RJS), 2011 WL 4552381, at *3–5 (S.D.N.Y. Sept. 28, 2011). The Directors do not appeal this aspect of the District Court's order.

In the same proceedings, the Directors filed a counter-claim against FIC and also sued third-party-defendant Travelers Casualty and Surety Company of America ("Travelers")—the provider of the seventh excess insurance policy in the tower. *See* note 2, *ante*. With respect to their counter-claim and third-party suit, and in response to the FIC's declaratory action, the Directors sought a declaration that "Federal and Travelers' coverage obligations are triggered once the total amount of [the Directors'] defense and/or indemnity *obligations* exceeds the limits of any insurance policies underlying their respective policies, regardless of whether such amounts have actually been paid by those underlying insurance companies." Joint App'x at 417 (emphasis supplied). The Directors then moved for partial summary judgment with respect to this request for declaratory relief.

In the same order granting FIC's motion on the "drop down" issue, the District Court denied the Directors' motion for partial summary judgment. Specifically, the Court held that "[i]n each policy, the excess coverage is not triggered until the underlying insurance is exhausted 'solely as a result of payment of losses thereunder,'" and therefore "the excess coverage will not be triggered solely by the aggregation of [the Directors'] covered losses." *Fed. Ins. Co.*, 2011 WL 4552381, at *7. Instead, the Court explained, "the Excess Policies expressly state that coverage does not attach until there is *payment* of the underlying losses." *Id.*

Following that decision, the parties submitted a letter to the District Court agreeing that "'all remaining claims and third-party claims should be dismissed with prejudice.'" *Fed. Ins. Co. v. Estate of Gould*, No. 10 Civ. 1160 (RJS) (S.D.N.Y. filed Oct. 30, 2011), ECF No. 69 (quoting the parties' letter

5

of Oct. 28, 2011). Pursuant to that agreement, the District Court ordered "that this case is dismissed with prejudice but without costs." *Id.*; *see also* Fed. R. Civ. P. 41(a)(2).[5]

The Directors then appealed the judgment, contesting only the Court's denial of their motion for partial summary judgment with respect to their request for declaratory relief.

## DISCUSSION

### A.

This case comes to us in an unusual posture—an appeal from a *voluntary dismissal* of a claim following the *denial* of a motion for partial summary judgment. We generally lack appellate jurisdiction to review voluntary dismissals of claims or denials of motions for summary judgment. *See Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.*, 814 F.2d 90, 94 (2d Cir. 1987) (voluntarily dismissed claims); *DiStiso v. Cook*, 691 F.3d 226, 239 (2d Cir. 2012) (denials of motions for summary judgment); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–94 (1998) (reciting the familiar rule that jurisdiction must exist before reviewing the merits). Nonetheless, for the reasons stated below, this case presents the unusual circumstances where we may review a final judgment that resulted from a voluntary dismissal following a denial of a motion for summary judgment.

Orders granting "Rule 41(a)(2) motions for voluntary dismissal are not usually appealable, since it is presumed that plaintiffs obtained that which they sought." *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 249 (5th Cir. 2006); *see also Empire Volkswagen*, 814 F.2d at 94. The rationale for this rule has little weight, however, where the appellant "lost on the merits and [is] only seeking an expeditious review." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681 (1958). In that situation, an appellant has not "'consent[ed] to a judgment . . . , but only that, if there was to be such

---

[5] Rule 41(a)(2) of the Federal Rules of Civil Procedure provides:

> Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper. If a defendant has pleaded a counterclaim before being served with the plaintiff's motion to dismiss, the action may be dismissed over the defendant's objection only if the counterclaim can remain pending for independent adjudication. Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice.

6

a judgment, it should be final in form instead of interlocutory, so that [an appeal may be taken] without further delay.'" *Id.* (quoting *Thomsen v. Cayser*, 243 U.S. 66, 83 (1917)).

For that reason, "'[w]hen the dismissal is with prejudice, plaintiffs have been allowed, in limited circumstances, to appeal from a voluntary dismissal when the plaintiffs' solicitation of the formal dismissal was designed only to expedite review of a prior order which had in effect dismissed plaintiffs' complaint.'" *Chappelle v. Beacon Commc'ns Corp.*, 84 F.3d 652, 653 (2d Cir. 1996) (alterations and internal quotation marks omitted) (quoting *Empire Volkswagen*, 814 F.2d at 94).[6] In order to qualify as an "effective dismissal" of the claim, *Empire Volkswagen*, 814 F.2d at 95, the adverse ruling must have rejected the claim "as a matter of law," *Palmieri v. Defaria*, 88 F.3d 136, 140 (2d Cir. 1996).[7] Because the invitation to dismiss must be designed only to secure immediate appellate review of an adverse decision, parties cannot appeal "a joint stipulation to voluntary dismissal, entered unconditionally by the court pursuant to a settlement agreement." *Concha v. London*, 62 F.3d 1493, 1507 (9th Cir. 1995). If claims unaffected by the adverse ruling are also pending, "[a] party who loses on a dispositive issue that affects only a portion of his claims may elect to abandon the unaffected claims, invite a final judgment, and thereby secure review of the adverse ruling." *Rabbi Jacob Joseph Sch. v. Province of Mendoza*, 425 F.3d 207, 210 (2d Cir. 2005) (quotation marks omitted). These strict requirements allow plaintiffs and counter-claimants to retain control of their own claims while also ensuring that voluntary dismissals are not used to obtain piecemeal appellate review. *See Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 172 (2d Cir. 2002) ("[T]he federal policy

---

[6] *See also OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*, 549 F.3d 1344, 1352–60 (11th Cir. 2008); *Libbey-Owens-Ford Co. v. Blue Cross & Blue Shield Mut. of Ohio*, 982 F.2d 1031, 1034 (6th Cir. 1993); *Trevino-Barton v. Pittsburgh Nat'l Bank*, 919 F.2d 874, 877–78 (3d Cir. 1990); 15A C. Wright et al., Federal Practice & Procedure § 3914.8 (Supp. 2013) (commenting that the rule announced in *Empire Volkswagen* "furthers all of the important values served by the final judgment rule" and "deserves general acceptance").

[7] In other words, the analysis in the District Court's decision must plainly indicate that a cross-motion for summary judgment would have been granted. *Cf. Barenboim v. Starbucks Corp.*, 698 F.3d 104, 108 (2d Cir. 2012) (explaining that on a cross-motion for summary judgment, the court must construe the evidence against the cross-movant).

7

against piecemeal appeals is not implicated where an entire case can be decided in a single appeal." (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 110 (2d Cir. 2000))).

The only claim at issue in this appeal is the Directors' request for a declaration that the relevant "coverage obligations are triggered once the total amount of [the Directors'] defense and/or indemnity obligations exceeds the limits of any insurance policies underlying their respective policies, regardless of whether such amounts have actually been paid by those underlying insurance companies."[8] Joint App'x at 417. On September 28, 2011, the District Court rejected this request as a matter of law.[9] The Court held that the "express language" of the relevant contract terms "establishes a clear condition precedent to the attachment of the Excess Policies," by "expressly stat[ing] that coverage does not attach until there is *payment* of the underlying losses." *Fed. Ins. Co.*, 2011 WL 4552381, at *7. In sum, the Court held, "the relief sought by [the Directors] contradicts the plain language of the Excess Policies." *Id.* at *6.

Although the Court's order denying the Directors' motion for summary judgment did not constitute a "final decision" appealable under 28 U.S.C. § 1291,[10] *see Ortiz v. Jordan*, 131 S. Ct. 884, 891 (2011) ("Ordinarily, orders denying summary judgment do not qualify as 'final decisions' subject to appeal."), the parties subsequently informed the District Court that they wished to dismiss with prejudice all pending claims and counter-claims pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure in order to obtain immediate appellate review, *see* note 5, *ante*. The District Court

---

[8] Accordingly, we limit our analysis of the jurisdictional issue to that counter-claim and do not consider whether any of the parties could have taken an appeal with respect to any other claim.

[9] Under both New York and Pennsylvania law, whether contract provisions are ambiguous is a question of law. If the relevant provisions are unambiguous, courts interpret and apply those provisions as a matter of law. *See Kripp v. Kripp*, 578 Pa. 82, 91–92 & n.5 (2004); *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162–63 (1990).

[10] 28 U.S.C. § 1291 provides, in relevant part: "The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States." In circumstances not presented in this case, an order denying summary judgment can constitute a "collateral order" from which a party may immediately appeal under § 1291. *See, e.g.*, *Mitchell v. Forsyth*, 472 U.S. 511, 524–30 (1985) (denial of summary judgment on qualified immunity grounds).

8

then issued an order to that effect. *See Fed. Ins. Co. v. Estate of Gould*, No. 10 Civ. 1160 (RJS) (S.D.N.Y. filed Oct. 30, 2011), ECF No. 69.

Once the District Court dismissed all pending claims and counter-claims with prejudice, an appeal became appropriate because (1) the District Court's order denying the Directors' motion for summary judgment plainly rejected the legal basis for the Directors' counter-claim; (2) the District Court had disposed of all claims with prejudice; and (3) the Directors' consent to the final judgment was designed solely to obtain immediate appeal of the prior adverse decision, without pursuing piecemeal appellate review. In these circumstances, we may review the District Court's judgment dismissing the Director's counter-claim.[11] *See Chappelle*, 84 F.3d at 653 (citing *Empire Volkswagen*, 814 F.2d at 94).

B.

i.

Turning to the merits, we review *de novo* a grant or denial of summary judgment, construing the record in the light most favorable to the non-moving party. *Mullins v. City of New York*, 653 F.3d 104, 113 (2d Cir. 2011). As in other contract disputes, insurance policies are interpreted according to their plain terms. *See Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co.*, 16 N.Y.3d 257, 264 (2011); *Harleysville Ins. Cos. v. Aetna Cas. & Sur. Ins. Co.*, 568 Pa. 255, 260–61 (2002).[12] Because the plain meaning of contractual terms can depend on context, *see Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 87 n.4 (2d Cir. 2002), we begin with a brief, general overview of excess liability policies, and then turn to the particular contractual language at issue.

---

[11] Although the District Court did not enter final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure, "failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58(a) does not affect the validity of an appeal from that judgment or order." Fed. R. App. P. 4(a)(7)(B); *see, e.g., Joseph v. Leavitt*, 465 F.3d 87, 89–90 (2d Cir. 2006) (recognizing jurisdiction absent entry of final judgment).

[12] In the District Court, the parties disputed whether New York or Pennsylvania substantive law applies. *See Fed. Ins. Co.*, 2011 WL 4552381, at *4. Because there is no conflict between the relevant substantive law in these states, however, we dispense with any choice of law analysis. *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).

9

In this context, "primary" insurance refers to the first layer of insurance coverage that attaches immediately upon the occurrence of a policy-defined liability or loss. *See Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co.*, 514 F.3d 327, 329 (4th Cir. 2008). "Excess liability policies, by contrast, . . . provide an additional layer of coverage for losses that exceed the limits of a primary liability policy. Coverage under an excess policy thus is triggered when the liability limits of the underlying primary insurance policy have been exhausted." *Id.*; *see also Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 93 (2d Cir. 2012) (describing how excess liability policies operate). And, as illustrated by this case, "[e]xcess insurance may also be designed to operate above another excess policy," with coverage under the higher-layer excess policies triggered once the lower-layer excess policies are exhausted. *Horace Mann Ins. Co.*, 514 F.3d at 329 n.1. Accordingly, "the very nature of excess insurance coverage is such that a predetermined amount of underlying primary coverage must be paid before the excess coverage is activated." *Gabarick v. Laurin Mar. (Am.), Inc.*, 649 F.3d 417, 422 (5th Cir. 2011) (alteration and quotation marks omitted). "Because coverage is only triggered after the primary insurance limit has been exhausted, excess insurance is generally available at a lesser cost than the primary policy since the risk of loss is less than for the primary insurer." *Id.* (alteration and internal quotation marks omitted).

**ii.**

We now turn to the relevant language in the excess policies. Both FIC policies state that excess liability coverage "shall attach only after all . . . 'Underlying Insurance' has been exhausted by *payment* of claim(s)," Joint App'x at 278, 289 (emphasis supplied), and that "exhaustion" of the underlying insurance occurs "solely as a result of *payment* of losses thereunder."[13] *Id.* at 273, 283 (emphasis supplied). Similarly, the Travelers policy states that excess liability coverage "shall attach

---

[13] The same paragraph in each FIC policy provides that "depletion" of the underlying insurance shall occur "solely as the result of payment of losses thereunder." Joint App'x at 273, 283.

10

only after all such Underlying Insurance has been exhausted," and that exhaustion occurs "solely as a result of *payment* of losses thereunder."[14]  *Id.* at 398 (emphasis supplied).

The Directors sought a declaration that these excess liability coverage obligations are triggered when "defense and/or indemnity obligations" reach the attachment point. But "obligations" are not synonymous with "payments" on those obligations. To hold otherwise would make the "payment of" language in these excess liability contracts superfluous. Accordingly, we agree with the District Court's conclusion that the "express language" of the relevant contract terms "establishes a clear condition precedent to the attachment of the Excess Policies," by "expressly stat[ing] that coverage does not attach until there is *payment* of the underlying losses." *Fed. Ins. Co.*, 2011 WL 4552381, at *7. Because the plain language of the contracts specifies that the coverage obligation is not triggered until *payments* reach the respective attachment points, the District Court properly denied the Directors' request for a declaration that coverage obligations are triggered once the Directors' defense and indemnity *obligations* reach the relevant attachment point.

The Directors make several arguments attacking the reasoning of the District Court, but their arguments are not persuasive. In fact, most of their arguments are inapposite because they are based on a misunderstanding of the District Court's order. The Directors' view is summarized in their reply brief:

> Given that [the Directors] sought a declaration as to whether the Excess Policies attach once liability exceeds the underlying limits regardless of whether those amounts have actually been paid "*by those underlying insurance companies*," implicit in the District Court's denial of the relief sought by [the Directors] is that exhaustion must occur as a result of actual payment by the underlying insurance companies, not [the Directors].

Reply Br. 8. This argument ignores the language and context of the District Court's order. The District Court never held that the underlying *insurers* must make payments before the obligations

---

[14] The same paragraph in the Travelers policy states that "depletion" of the underlying insurance shall occur "solely as the result of actual payment of losses thereunder by the applicable insurers." Joint App'x at 398.

11

under the relevant excess policies are triggered. Rather, the District Court—echoing the terms of the relevant insurance policies—described the exhaustion requirement in the passive voice and did not specify which party was obligated to make the requisite payments. *See Fed. Ins. Co.*, 2011 WL 4552381, at *7 ("[T]he Excess Policies expressly state that coverage does not attach until there is *payment* of the underlying losses.").

The District Court did not err in doing so. Denying the Directors' request did not require ruling on whether the underlying insurers, in particular, were required to make payments; the Directors simply sought a declaration that the excess policies' coverages are triggered once the respective attachment points are reached—*i.e.*, once the amount of "defense and/or indemnity obligations exceeds the limits of any insurance policies underlying their respective policies."[15]

Nor do we find persuasive the Directors' reliance on *Zeig v. Massachusetts Bonding & Insurance Co.*, 23 F.2d 665 (2d Cir. 1928).[16] In that case, Manhattan dressmaker Louis Zeig had purchased property insurance totaling $15,000 in coverage, plus an excess policy that attached after the primary insurance was "exhausted in the payment of claims to the full amount of the expressed limits." 22 F.2d at 666 (quotation marks omitted). In a subsequent burglary, Zeig lost more than $15,000 in property. He initially filed claims for $15,000 with the primary insurance providers but ultimately settled those claims for $6,000. *Id.* Because the losses from the burglary were greater than $15,000, however, Zeig also filed a claim under the excess policy, attempting to recover his losses in excess of

---

[15] The District Court also appropriately noted that the relevant excess insurance policies contemplate continued coverage even if the Directors fail to maintain underlying insurance policies at all. *See Fed. Ins. Co.*, 2011 WL 4552381, at *2 ("Failure to comply with the foregoing [maintenance-of-insurance requirement] shall not invalidate this policy but the Company shall not be liable to a greater extent than if this condition had been complied with." (quoting the relevant insurance agreements)). And requiring nonoperational insurance companies to make payments as a condition precedent to the attachment would be odd, effectively relieving FIC and Travelers of their policy obligations, and leaving the Directors without coverage, on account of the insolvency of the underlying insurance providers. *See Waste Mgmt. of Minn., Inc. v. Transcont'l Ins. Co.*, 502 F.3d 769, 774 (8th Cir. 2007).

[16] Though not necessary to our decision, it bears recalling that the freestanding federal common law that *Zeig* interpreted and applied no longer exists. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), *overruling Swift v. Tyson*, 41 U.S. 1 (1842).

12

$15,000. The legal dispute turned on how the excess policy was triggered—namely, whether it applied even though Zeig settled the primary claims for less than their face value.

Writing for the Court, Judge Augustus N. Hand explained that "[i]t is doubtless true" that the parties could, "if they chose to do so," require actual payment of $15,000 as a condition precedent to liability. *Id.* But imposing this obligation, Judge Hand noted, would be "unnecessarily stringent" and serve "no rational interest" of the excess insurer, "so long as it was only called upon to pay such portion of the loss as was in excess of the limits of those [primary] policies." *Id.* Indeed, as Zeig had suffered out-of-pocket losses valued over $15,000, he could only damage *his own* interest by settling his primary claims for less than their face value, not damage the interest of the excess insurers. Because a natural reading of the contract would be "harmful to the insured, and of no rational advantage to the insurer," the Court construed the contract to mean that Zeig still had to exhaust his primary *claims* for $15,000, and that this could be done not only through full cash payment but also through a settlement agreement. *Id.* Accordingly, the Court held that Zeig "should have been allowed to prove the amount of his loss, and, if that loss was greater than the amount of the expressed limits of the primary insurance, he was entitled to recover the excess to the extent of the policy in suit." *Id.*

The Directors argue that *Zeig* controls here. But their argument neglects important differences between *Zeig* and this case. In fact, nothing is inherently errant or unusual about interpreting an exhaustion clause in an excess *liability* insurance policy differently than a similarly written clause in a first-party *property* insurance policy. "[I]n interpreting contractual language," like language in any other legal text, "[t]he text should always be read in its context." *Int'l Multifoods Corp.*, 309 F.3d at 87 n.4 (quotation marks omitted). It is a "well-established rule of construction . . . that words can take on different meanings in different contexts." *Am. Home Assurance Co. v. Republic Ins. Co.*, 984 F.2d 76, 78 (2d Cir. 1993); *cf. Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The

13

plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

Moreover, as the District Court explained, *Zeig* and the other related cases on which the Directors rely "principally address situations in which a policy was deemed exhausted as a result of an insured's below-limit settlement of indemnity claims with an underlying carrier." *Fed. Ins. Co.*, 2011 WL 4552381, at *7; *see Fed. Ins. Co. v. Srivastava*, 2 F.3d 98, 103 (5th Cir. 1993) ("Judge [Augustus N.] Hand [in *Zeig*] assumed that the insured's *loss* was fixed before any settlement with the primary insurers. With the loss set, there was little danger that primary insurers could, contrary to the contracted-for risk, shift any part of their burden to excess carriers. With a burglary of property, the insured loss was established."); *see also Great N. Ins. Co. v. Mount Vernon Fire Ins. Co.*, 92 N.Y.2d 682, 688 (1999) ("[T]he goal of first-party property coverage . . . is to reimburse the insured for the insured's actual property loss . . . ."). In those cases, the insured suffered out-of-pocket losses (for instance, through the loss of property, or through liability payments to a third party) for which the insured sought indemnification. The Directors' requested relief, by contrast, focuses on their *obligations* to pay third parties. In these circumstances, we agree with the District Court that this difference is relevant when structuring (and interpreting) a liability insurance policy.[17] As the District Court noted, FIC and Travelers

> have a clear, bargained-for interest in ensuring that the underlying policies are exhausted by actual payment. If [the Directors] were able to trigger the Excess Policies simply by virtue of their aggregated [but unpaid] losses, they might be tempted to structure inflated settlements with their adversaries in the Bahamas Litigation that would have the same effect as requiring the Excess Insurers to drop down and assume coverage in place of the insolvent carriers.

---

[17] Indeed, the sixth excess policy, *see* note 2, *ante*, which is not directly at issue in this appeal, is even clearer in this respect, stating that: "Coverage shall attach only after all such Underlying Insurance has been exhausted solely as a result of actual payment or payment in fact of losses of all applicable Underlying Insurance limits . . . ." Joint App'x 406. Of course, the fact that one contract is even clearer than another does not make the other contract ambiguous.

14

*Fed. Ins. Co.*, 2011 WL 4552381, at *7. In other words, the excess insurers here had good reason to require actual payment up to the attachment points of the relevant policies, thus deterring the possibility of settlement manipulation. In this context, the plain meaning of the phrase "payment of losses" refers to the actual payment of losses suffered by the Directors—not the mere accrual of losses in the form of liability.

## CONCLUSION

To summarize, we hold that:

(1) In the circumstances of this case, we have jurisdiction to review the voluntary dismissal of a claim following the denial of a motion for summary judgment. We have jurisdiction because (a) the District Court had plainly rejected the legal basis for the Directors' counter-claim; (b) it had disposed of all claims with prejudice; and (c) the Directors' consent to the final judgment was designed solely to obtain immediate appeal of the prior adverse decision, without pursuing piecemeal appellate review.

(2) The plain language of the relevant excess insurance policies requires the "payment of losses"—not merely the accrual of *liability*—in order to reach the relevant attachment points and trigger the excess coverage.

Accordingly, the judgment of the District Court is **AFFIRMED**. Additionally, the appellees' motion for judicial notice is **DENIED**.[18]

---

[18] *See* note 4, *ante*.